*Henry A. Strong,* for appellant.     *Doyle & Fitts,* for respondents.

LANDON, J.   This action was prematurely brought.   The contract was not for necessaries, and therefore was not obligatory.   It was not clearly to the disadvantage of the infant, and therefore was not void.   It was of an uncertain nature as to benefit or prejudice, and therefore was voidable.   2 Kent, Comm. 236; *Chapin* v. *Shafer,* 49 N. Y. 407; *Henry* v. *Root,* 33 N. Y. 526; *Sparman* v. *Keim,* 83 N. Y. 245.   But, while the defendant's infancy continued, he was incapable of affirming or disaffirming it.   He has his election after becoming of age.   *Beardsley* v. *Hotchkiss,* 96 N. Y. 201, 211; *Walsh* v. *Powers,* 43 N. Y. 23, and cases *supra.*   The defendant was still an infant when this action was tried.   Judgment reversed, with costs.   All concur.

---

PEOPLE *ex rel.* McCORMACK *v.* FRENCH *et al.,* Police Commissioners.

*(Supreme Court, General Term, First Department.   May 23, 1890.)*

MUNICIPAL CORPORATIONS—DISCHARGE OF POLICEMAN.
   The action of the police commissioners in discharging relator will not be disturbed on *certiorari* where the intoxication charged is proved by several witnesses, and relator's defense that his condition resulted from taking medicine prescribed by a physician is supported only by a certificate of the physician that he prescribed for relator "a mixture containing chloroform," the prescription not being produced.

*Certiorari* by Patrick McCormack to review the action of Stephen B. French and others, constituting the board of police commissioners, discharging relator from the police force.

Argued before VAN BRUNT, P. J., and BARTLETT and BARRETT, JJ.

*Edward Mackinley,* for relator.     *Alexander D. Keyes,* for respondents.

BARRETT, J.   This case comes directly within the principle of *People* v. *French,* 110 N. Y. 494, 18 N. E. Rep. 133.   The relator's intoxication was clearly proved by a large number of witnesses.   His defense was that his condition resulted from the taking of medicine prescribed by a physician. The prescription was not produced, but the physician certified that, "several days" before the relator's trial, he had prescribed "for the bearer, Mr. Mc-Cormack, a mixture containing chloroform."   It seems that the physician had never seen McCormack, but that the prescription and certificate were given to one McGuire, who was an acquaintance of McCormack's, and who undertook to procure medical assistance for him.   The entire story about the prescription, and the proof with regard to the administration of a mixture containing chloroform, were too vague, and even suspicious, to carry conviction, and we think the commissioners were entirely justified in disregarding the attempted explanation on that head.   They were also justified in rejecting the relator's testimony in view of its evident incorrectness with regard to matters of detail, as to which the accusing witnesses could not have been mistaken.   These witnesses all testified that when McCormack was brought to the station-house his clothing was dirty and dusty, and that he presented the appearance of a man who had been engaged in a fight.   Yet the relator declared that all this was untrue, and that his clothing was then as clean as it was at the time of his trial.   The preponderance of testimony was decidedly against the relator, and the proceedings should be affirmed.   All concur.

---

*In re* BISHOP'S WILL.

*(Supreme Court, General Term, Third Department.   May 26, 1890.)*

WILLS—UNDUE INFLUENCE—SUBMISSION TO JURY.
   On an issue whether a will was the result of undue influence on the part of testator's daughter, there was evidence that, at the time of its execution, testator

was 67 years old, and feeble in mind and body; that his relations with his daughter were such that he would avoid and hide from her, and had described her as being "one of the most cold-hearted daughters;" that testator had six months previously executed a will making a fair distribution of his property among his wife and children; that this will came to the possession of the daughter, who wrote testator, imploring him to see her, so that he might "look at things in a different light;" that, after repeatedly avoiding her, testator had frequent interviews with her, some of which irritated him, while others moved him to tears; and that the will in question was then executed upon the model of the old one, with important amendments in favor of the daughter and her children, and to the probable exclusion of testator's favorite son and his children. There was also evidence that testator had remarked upon the importunity of his daughter, and had stated that he had to make three wills before he could satisfy her. *Held*, that the question as to undue influence should have been submitted to a jury.

Appeal from surrogate's court, Rensselaer county.

Charles B. Bishop and Percy J. T. Bishop appeal from a decree admitting to probate the will of their deceased father, Charles B. Bishop.

Argued before LEARNED, P. J., and LANDON and MAYHAM, JJ.

*Mathew Hale,* for appellants.   *R. H. McClellan,* for respondents.

LANDON, J.   So far as the testimony of the subscribing witnesses extends, the instrument proposed for probate was executed and published in due form, and is the genuine last will and testament of the decedent. Its probate was contested upon the ground that it was made and executed under the undue influence of Frances Cluett, the daughter of the decedent. Mrs. Cluett and her children are the chief beneficiaries under the will. The allegation of undue influence is sought to be supported by circumstantial evidence. The charge, in substance, is that Mrs. Cluett had the motive, the opportunity, and an easy victim, and by the practice of her arts and irresistible importunities accomplished her purposes. The instrument in question was executed in November, 1886, and Mr. Bishop, the decedent, died in June, 1889. Mr. Bishop was about 70 years of age at the time of his death. He left an estate worth from $50,000 to $75,000. He left a widow and three adult children surviving him. Mrs. Cluett, his daughter, had four children, the eldest 23 and the youngest 12 years of age. His son Charles was 40 years of age, unmarried, and resided with him. His son Percy had a wife and child. All lived in the city of Troy. The surrogate found that the decedent had, for many years before the execution of the alleged will, been addicted to the periodical excessive use of intoxicating liquors; also to the use of morphine in various forms. The testimony tended to show that the decedent, prior to the date of the execution of the will, was much broken in mental strength and vigor. Always somewhat eccentric, his eccentricities increased. The decay of his mental powers was indicated by his frequent repetition to the same persons, in the same interview, of the same incidents of his early life. It is not contended that he did not have sufficient mental strength to amount to testamentary capacity.

The surrogate found that the decedent's son Percy Bishop had been lame from his infancy, and was upon that account the object of his father's special affection and solicitude; and that there is no evidence other than the alleged will that there was ever any estrangement between them, or between the decedent and Percy's child, or that there was any change in his feelings after the execution of the alleged will; and that the decedent had expressed affection for Percy, and had expressed his intention to provide for Percy's child as he did for his other grandchildren. In May, 1886, about six months before the execution of the alleged will, the decedent executed a will. This will was drawn by Mr. King, who had long been his legal adviser. This will was much more favorable to Percy and his child than that under consideration.

The relations between Mrs. Cluett and her father deserve notice. In a letter addressed to her husband, the decedent, speaking of Mrs. Cluett, says: "I think she is one of the most cold-hearted daughters and sisters that I ever

knew.  I have sometimes thought I would  never go into your house again.
I would not, was it not for the children.  *  *  *  Fanny [Mrs. Cluett] drove
me out of the church, and wants to drive Charlie [the decedent's son] out of the
city.  If he goes, I go too, sure.  I think he has more honor and honesty than
all your clerks put together."  The testimony shows that the testator was usu-
ally irritable after having had a conversation with Mrs. Cluett, and sometimes
in tears; that sometimes when he heard her voice, he would get up quickly,
and try to go away.  He would sometimes hide from her in the closet, some-
times go out the back door, and at other times would meet her.  Mrs. Bishop,
the widow of the decedent, and mother of Mrs. Cluett, was very deaf.  She
testifies to frequent interviews between the decedent and Mrs. Cluett in 1886,
and that she asked Mrs. Cluett what the conversations were about, and Mrs.
Cluett replied that it was none of her business; that she had no right to know.
A letter written by Mrs. Cluett to her father, without date, was read in evi-
dence.  It earnestly solicited an interview, and contained these expressions:
"If I could see you and talk with you where I would not feel afraid the very
walls were listening, I could relieve my mind, and show you in figures what
I cannot explain any other way.  So wont you do this favor for me, by just
coming up here [they lived in separate houses] to see me?  I do not wish to
take a penny from a living being that does not belong to me.  Have I com-
plained of not having as much as others?  I feel sure this is the time to put
things in good shape, and, when I see you, I can tell you some things I could
not say at the house or before Fred [her husband] on account of his feelings,
but could talk better with you alone, and you may look at things in a differ-
ent light after seeing me,—not for my sake alone, but for the children.  This
is the time to look well into the matter."  Some explanation was made to the
effect that this letter had reference to another matter than the will, but the
explanation is not satisfactory, and does not command our confidence.  We
have no doubt the letter did refer to will-making.

It appears from the evidence that the will of June, 1886, came into the
hands of Mrs. Cluett in August of that year.  She exhibited it to her friend
Mrs. Avery, and to a lawyer of Baltimore, whom she met at Rehoboth Beach.
She suggested doubts to her father about its interpretation.  She knew that
Mr. King was her father's legal adviser, but she arranged to have Mr. Peck,
a comparative stranger to her father, supersede Mr. King.  Twice she saw
Mr. Peck.  At one interview, at least six weeks before her father conferred
with him, she handed him the will of June, or a copy of it, for his examina-
tion.  Mr. Peck had no suspicion that the decedent was under the influence
of Mrs. Cluett.  After the will of November was executed, the decedent
asked Mr. Peck to communicate the contents of it to Mrs. Cluett.  The dece-
dent remarked to Mrs. Sullivan, his domestic servant for 25 years, that Mrs.
Cluett had consulted a lawyer about his will.  Mrs. Sullivan told him that it
was very queer that Mrs. Cluett should know all about his will business, and
that Mrs. Bishop, his wife, should not know anything; to which he replied
that if Mrs. Bishop should know what was going on between him and Mrs.
Cluett she would go crazy.  He had made a will as early as 1848.  He said
to others that he had to make three wills before he could satisfy Fanny,
(Mrs. Cluett.)  The decedent by his alleged will, after making provision for
debts, a monument, and bequeathing to his widow certain policies of life in-
surance and his household goods and furniture, and certain articles to two
of the children of Mrs. Cluett, devises and bequeaths the rest and residue of
the property to his executors in trust during the lives of his son and daughter
Charles and Frances, and the survivor of them, to pay to his widow and three
children each one-fourth part of the income.  Then various contingencies are
specified and directions given upon the event of their occurrence.  The ulti-
mate probable effect will be that, upon the termination of the trust, Percy,
if living, will receive $500, and no more.  If he shall have previously died,

his child or children will have received $300 each from the income, and will receive no more, and Mrs. Cluett's children will receive the entire remainder of the estate. Under the former will, which, like this, gave practically the same rest and residue to the same executors in trust to continue for the same lives, Percy during the continuance of the trust would receive one-fourth of the income during his mother's life, one-third upon her death, and one-half if both his mother and Charles should die during the life of himself and Frances. Upon the termination of the trust, he would, if living, share equally with all the grandchildren, his own children being reckoned among them, and ultimately his child or children would share equally with all the other grandchildren. This change in testamentary disposition is manifestly unjust to Percy and his child or children. It seems to be, in view of the evidence in the case, unaccountable upon any reasonable hypothesis, except that which the case suggests, namely, the influence of Mrs. Cluett. Her activity and effort appear, independently of her letter to her father. The letter, if, as we think it is, a step in the case, is confirmatory, and indicates her anxiety and zeal. A jury might well assume that she omitted none of the influences at which the letter hints. She had much to say, and she implored her father to see and hear her, to the end that he "may look at things in a different light,—not for my sake alone, but for the children." He repeatedly avoided her, but he yielded at last, and did see and hear her, not once only, but repeatedly. Sometimes she irritated him, and sometimes moved him to tears. Finally she obtained the custody of his existing will, and then apparently became his confidential adviser. Of course, she could then proceed intelligently. She selected and conferred with a new legal adviser, but her father, broken as he was, lagged for six weeks behind her urgency. Possibly he sought relief by temporizing with her; if so, he did not thus escape. The new will was finally made upon the model of the old one, with the important amendments in favor of Mrs. Cluett's children. It is not improbable that, after all, her father yielded more to her entreaties for her children than to those for herself; for when the new will was made he desired the draughtsman to perform the service, unpleasant to him, of informing Mrs. Cluett, and explaining to her its provisions. His statements to his domestic and others indicate that the importunity of Mrs. Cluett was so much upon his mind that he could not refrain from remarking upon it.

Undue influence must be proved. It is not enough that it is suspected. But in such cases it is usually proved by circumstances. We have recounted some of the leading circumstances which we think deserve careful scrutiny, —a scrutiny which, taking notice of the fact that this apparently unjust will was made, must solve the question whether it was the free act of the testator, or an act done by him under the undue influence of Mrs. Cluett. She had the right to request him to make his will in her favor, and in favor of her children, but she had no right to importune, annoy, and distress him to the extent of inducing him, in order to make his peace, or pacify her, or for any other purpose inspired by her, to suppress or abandon his own wishes and intention respecting his testamentary disposition of his property, or any part of it, and substitute in his will her disposition or her wishes or her will in place of his own, and in consequence leave his own unexpressed in part or in whole. This is but another form of stating that the will must be the free act of the testator, and not an act done under the constraint of another. We are not satisfied that the surrogate gave to the circumstances of this case the weight and effect which they reasonably and naturally ought to have. We must therefore refer the main issues to a jury for their determination. The decree is accordingly reversed, and the issues respecting the capacity of the testator, and his freedom from undue influence, sent to be tried by a jury at the Rensselaer circuit. The costs of this appeal allowed the appellant out of the estate. Other costs to abide the final award of costs. All concur.